UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 2010-CV-

LENOX MACLAREN SURGICAL CORPORATION,
a Colorado corporation

      Plaintiff

v.

MEDTRONIC, INCORPORATED,
a Minnesota corporation;
MEDTRONIC SOFAMOR DANEK, INCORPORATED,
an Indiana corporation;
MEDTRONIC PS MEDICAL, INCORPORATED,
d/b/a MEDTRONIC NEUROLOGIC TECHNOLOGIES,
a California corporation; and
MEDTRONIC SOFAMOR DANEK CO., LTD.,
a Japanese corporation.

      Defendants.

---

## COMPLAINT

Plaintiff Lenox MacLaren Surgical Corporation ("Lenox MacLaren"), through counsel, Polsinelli Shughart PC and Sheridan Ross P.C., and pursuant to F.R.C.P. 7 and 8, respectfully submits its Complaint against Defendants Medtronic, Incorporated; Medtronic Sofamor Danek, Incorporated; Medtronic PS Medical, Incorporated; and Medtronic Sofamor Danek Co., Ltd. (collectively "Medtronic" or the "Medtronic Defendants"), and states as follows:

### PRELIMINARY STATEMENT

This case derives from the monopoly power of Medtronic in the market for bone mills used in spinal fusion surgical procedures. Medtronic obtained a monopoly through

1

anticompetitive behavior – behavior that irreparably damaged the market by destroying Lenox MacLaren's ability to successfully market and sell its groundbreaking and relatively inexpensive bone mill (the "Lenox MacLaren Bone Mill").  The Medtronic Defendants, upon learning about the revolutionary Lenox MacLaren Bone Mill, approached Lenox MacLaren about the possibility of entering into a distributor agreement.  Medtronic Sofamor Danek, USA, Inc. ("MSD USA"), a Medtronic affiliate, entered into an Exclusive Supply and License Agreement with Lenox MacLaren, whereby MSD USA had the exclusive right to purchase and distribute Lenox MacLaren Bone Mills.  MSD USA, in conjunction with the Medtronic Defendants, used the Agreement to loan Lenox MacLaren Bone Mills to surgeons and hospitals, instead of selling them as reasonably expected by Lenox MacLaren.  The loaner program had the effect of generating immense interest in the Lenox MacLaren Bone Mill amongst hospitals and surgeons, while preventing actual market penetration.  Meanwhile, as Medtronic was cultivating interest in, but refusing to sell, the Lenox MacLaren Bone Mill, Medtronic was simultaneously developing its own competing and costlier bone mill.  After the termination of the Agreement, Medtronic initiated a disingenuous, improper recall and FDA investigation to tarnish the reputation of the Lenox MacLaren Bone Mill.  Medtronic consummated its monopoly by filling the vacuum in the market resulting from the improper Lenox MacLaren Bone Mill recall with actual sales — as opposed to loans — of its own product.

Medtronic used the Lenox MacLaren Bone Mill to cultivate a market for a sophisticated and novel surgical device, but knew it would have to destroy the Lenox MacLaren Bone Mill's reputation before Medtronic could introduce Medtronic's much costlier product into the market. Today, Medtronic enjoys at least a 70% share of the surgical bone mill market, reaping

potentially hundreds of millions of dollars in profit.  In contrast, the groundbreaking Lenox MacLaren Bone Mill, which despite being commercially and professionally more desirable than Medtronic's product, has been eliminated from the marketplace and is unable to compete by virtue of the dynamics of the marketplace.  The market has suffered a loss of competition, loss of a superior product, and the increased cost associated with the remaining monopolist's product.

## THE PARTIES

1.      Lenox MacLaren Surgical Corporation is a corporation organized under the laws of the State of Colorado and has a principal place of business at 657 South Taylor Avenue, Suite A, Louisville, Colorado 80027.

## The Medtronic Defendants

2.      Medtronic, Incorporated ("Medtronic, Inc.") is a corporation organized under the laws of the State of Minnesota and has a principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.

3.      Medtronic, Inc., a publicly-traded conglomerate with a market capitalization of $37.7 billion, is the "world's largest independent medical technology company."

4.      Medtronic, Inc. is the parent of approximately 213 wholly-owned subsidiaries operating throughout the United States and worldwide.

5.      Medtronic, Inc. is internally divided into six business groups: (1) Cardiac Rhythm Disease Management; (2) Spinal and Biologics; (3) Cardiovascular; (4) Neuromodulation; (5) Diabetes; and (6) Surgical Technologies.

2734113.08

6.     Upon information and belief, the business groups are organized based on product lines, and each business group typically includes multiple Medtronic, Inc. subsidiaries and affiliates.

7.     Upon information and belief, the six business groups have informal subgroups, organized around product lines and markets that those product lines serve.

8.     Medtronic, Inc. and its subsidiaries utilize a distributor and representative network that encompasses the entire United States and key international markets.  Upon information and belief, the distributor and representative network is engaged by Medtronic, Inc. on behalf of numerous of its subsidiaries to sell products across numerous individual business groups and/or subgroups.

9.     Medtronic Sofamor Danek, Incorporated ("Sofamor Danek") is a corporation organized under the laws of the State of Indiana and has a principal place of business at 2600 Sofamor Danek Drive, Memphis, Tennessee 38132.  Sofamor Danek is a wholly owned subsidiary of Medtronic, Inc.

10.     Medtronic PS Medical, Incorporated ("Medtronic PS Medical") is a corporation organized under the laws of the State of California and has a principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.  Medtronic PS Medical is a wholly owned subsidiary of Medtronic, Inc.

11.     Medtronic Sofamor Danek Co., Ltd. ("Sofamor Danek Japan") is a corporation organized under the laws of Japan with a principal place of business, upon information and belief, at KM Nishiumeda Building 3F, 7-20-1, Fukushima, Fukushima-KU, Osaka, Japan,

2734113.08

5530003.  Upon information and belief, Sofamor Danek Japan is a wholly-owned subsidiary of Medtronic, Inc.

12.      Medtronic, Inc. is the ultimate corporate parent of the defendant entities named in this Complaint.  Medtronic, Inc., as parent corporation, has direct control and authority over the activities of its subsidiaries and affiliates.

13.      Medtronic, Inc. directed, controlled, and encouraged its subsidiaries, including Defendants Sofamor Danek, Medtronic PS Medical, and Sofamor Danek Japan to engage in the anticompetitive conduct alleged in this Complaint.

<b><u>JURISDICTION & VENUE</u></b>

14.      This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331, as it arises under federal law, specifically the Sherman Antitrust Act, 15 U.S.C. § 2, *et seq*.  This Court also has jurisdiction under 15 U.S.C. § 4.

15.      Alternatively, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because Lenox MacLaren is incorporated and has its principal place of business in Colorado, none of the Medtronic Defendants are incorporated nor have their principal place of business in Colorado, and the amount in controversy exceeds $75,000.00.

16.      This Court has personal jurisdiction over the Medtronic Defendants because, upon information and belief, they have systematic and continuous contacts in this judicial district, including, but not limited to: (a) the regular transaction of business within Colorado; (b) the regular sale of Medtronic products in Colorado; (c) the presence of Medtronic property, facilities, and representatives in Colorado; and (d) Medtronic, Inc. is qualified to transact business and maintains a registered agent for service of process in Colorado.

2734113.08

a.      Medtronic, Inc., upon information and belief, has one or more research and development, manufacturing, and distribution centers in Colorado, including in Louisville, Colorado.

b.      Sofamor Danek, upon information and belief, has offices in Colorado.

c.      Medtronic PS Medical, upon information and belief, regularly transacts business in Colorado, including, but not limited to, product sales.

d.      Sofamor Danek Japan regularly transacts business in Colorado, including business with Lenox MacLaren.   Sofamor Danek Japan regularly purchased replacement parts for products at issue in this case from Lenox MacLaren during time periods relevant to this case.

17.     Venue is proper in this District under 28 U.S.C. § 1391(c) because the Medtronic Defendants, all of which are corporations, are subject to personal jurisdiction in the State of Colorado.

## GENERAL ALLEGATIONS

18.     Medtronic used anticompetitive practices to exclude Lenox MacLaren from the surgical bone mill market.  Medtronic, through a calculated, multi-step scheme eliminated the superior product, the Lenox MacLaren Bone Mill, from the market, resulting in a Medtronic monopoly able to exact an inflated price of at least 25 times the cost of the Lenox MacLaren Bone Mill in the marketplace.

### The Lenox MacLaren Bone Mill Is A Revolutionary Product That Medtronic Sought To Distribute Exclusively In The Market.

19.     Bone mills are a critical tool for spinal fusion surgeries.  The number of spinal fusion surgeries is increasing throughout the world, and with it, the demand for surgical bone

mills.  The Lenox MacLaren Bone Mill — the product of years of research and development by Linda Lenox, the inventor of the Lenox MacLaren Bone Mill — was uniquely positioned to meet this growing demand before Medtronic's anticompetitive conduct eliminated the Lenox MacLaren Bone Mill from the market.  This harmed the market and substantially harmed Lenox MacLaren's business.

### *Lenox MacLaren Has a History of Innovation in the Neurosurgical Instrument Field*

20.     Linda Lenox founded Lenox MacLaren in approximately 1987 to research, invent, develop, and manufacture precision neurosurgical instruments.  Linda Lenox does not have formal engineering or medical training, but has over five decades of design and fabrication experience and is widely hailed as an innovator in the neurosurgical instrument field.  Linda Lenox has invented and holds patents on four medical devices and has designed and developed hundreds of instruments in use today by skilled surgeons.

21.     Lenox MacLaren's first laboratory occupied Linda Lenox's garage. Ten years later, after successfully inventing, promoting, and selling a variety of neurosurgical instruments, Lenox MacLaren moved into its current facility, a highly sophisticated laboratory and workshop. Lenox MacLaren Surgical Corporation officially incorporated in 2000.

22.     Today, Linda Lenox continues to invent and develop cutting-edge neurosurgical instruments.  Lenox MacLaren is the exclusive manufacturer of multiple lines of precision neurosurgical instruments used by surgeons worldwide.

### *Bone Mills are an Essential Tool for Spinal Fusion Surgeries*

23.     Spinal fusion surgery is a common procedure where two or more vertebrae are fused together to address degenerative spinal conditions and alleviate back pain caused by

2734113.08

abnormal alignment of the vertebrae.  Abnormal alignment of the vertebrae results from a number of conditions such as fractures, spinal disc herniation, spinal tumors, degenerative disc disease, and other degenerative spinal conditions.  Spinal fusions often include the implantation of rods, screws, or other devices that help stabilize the vertebrae.

24.     An estimated 2.8 million spinal fusion surgeries are performed each year worldwide.  In the United States alone, an estimated 900,000 spinal fusion procedures per year — 75,000 procedures per month — are performed.

25.     Most spinal fusions require some bone removal to access the target area, and require some bone implant in the target area that "fuses" over time with the patient's healthy, living bone tissue (*i.e.*, spinal fusion).  To replace the removed bone and assist with fusing the vertebrae, bone tissue is frequently harvested from a different area of the patient's body and grafted onto the spinal fusion area.

26.     Harvested bone tissue must be ground (milled) before it can be used in the spinal fusion.  The milled bone material is then inserted and packed around the target area and assists the body's natural bone formation process, repairing and rebuilding the bone in the affected area.

27.     A bone mill grinds harvested bone fragments into a specific consistency that is required for grafting in spinal fusion surgeries.

28.     Bone fragments must be milled smoothly and consistently to prevent rejection by the patient.  It is critical to the success of the bone graft, and thus to the overall surgery, that the patient not reject the grafted bone.

29.     If fragments are milled inconsistently, a surgeon is forced to restart the procedure, obtaining new bone fragments from the patient's body or from a donor.

2734113.08

***The Lenox MacLaren Bone Mill Is the Most Precise Bone Mill Available***

30.     Prior to the Lenox MacLaren Bone Mill, the process of milling bone for spinal fusion surgeries was highly imprecise.  Surgeons relied on nurses who attempted to manually cut and grind the bone fragments with side-cutters, surgical scissors, or other instruments not designed for that purpose.  Early bone mills were also highly variable in their milling of bone to the specific consistency required for grafting or were not usable in an operating room environment.

31.     Frustrated with the lack of a consistent bone mill, and knowing Lenox MacLaren's reputation for quality neurosurgical instruments, three Colorado-based surgeons approached Lenox MacLaren about developing a more effective bone mill.

32.     In 1999, Lutheran Hospital in Denver, Colorado provided Lenox MacLaren with an "open" purchase order, allowing Lenox MacLaren to begin developing its bone mill.

33.     Linda Lenox invented the Lenox MacLaren Bone Mill in 1999 after months of focused development, extensive research, and communications with spinal surgeons about the features necessary for a bone mill.  Lenox MacLaren filed a provisional patent application for the Lenox MacLaren Bone Mill in December 1999.  The patent issued in November 2002.  The three surgeons who had previously requested the bone mill were provided with prototypes of the Lenox MacLaren Bone Mill in 1999.  The Lenox MacLaren Bone Mill was the product of years of experience and Linda Lenox's inventive curiosity.

34.     The Lenox MacLaren Bone Mill mills bone fragments with a high degree of precision, consistently producing uniform bone fragments.  Unlike other bone mills requiring

large motors or independent power sources, the Lenox MacLaren Bone Mill is driven by a hand-driven grinding assembly.

35.     The hand-driven grinding assembly uniformly mills bone, every time, regardless of the speed at which the user manipulates the hand-crank.  The harvested bone tissue is fed through the Lenox MacLaren Bone Mill from top to bottom as the grinding assembly is turned. The length of time the grinding assembly is turned affects only the volume of milled bone produced, but does not change the consistency of the milled bone.  Thus, any person using the Lenox MacLaren Bone Mill will produce an identical milled bone substance.

36.     The Lenox MacLaren Bone Mill is also advantageous because it is unpowered, small, and portable.  The hand-driven grinding assembly allows the Lenox MacLaren Bone Mill to be unencumbered by cords, batteries, or independent power sources, enhancing its portability and versatility during surgery.  These features allow surgeons and other hospital personnel to easily move the Lenox MacLaren Bone Mill around the operating room during surgeries.

37.     The Lenox MacLaren Bone Mill's hand-driven grinding assembly also ensures that bone cells remain intact during milling.  If harvested bone tissue is cut too forcefully, as in an electric mill, the bone cells can be structurally compromised and rendered useless. Similarly, an electric bone mill left running too long can compromise cellular integrity.  The Lenox MacLaren Bone Mill's innovative hand-driven grinding assembly prevents both of these problems.

38.     The Lenox MacLaren Bone Mill also offers the advantage of reusability. Constructed of stainless steel, the Lenox MacLaren Bone Mill may be sterilized after each surgery and reused without purchasing disposable components.

2734113.08

39.     One of the doctors who requested that Lenox MacLaren develop a bone mill, Dr. Tom Lowe, was a Medtronic consultant.  Dr. Lowe used the prototype Lenox MacLaren Bone Mill in demonstration surgeries sponsored by Medtronic and at a seminar.  Lenox MacLaren sold several Lenox MacLaren Bone Mills as a result of Dr. Lowe's demonstrations.

40.     One surgeon who purchased a Lenox MacLaren Bone Mill after observing Dr. Lowe's seminar subsequently used the Lenox MacLaren Bone Mill in a surgery observed by two high-level Medtronic representatives, Michael DeMane and Art O'Neal. After witnessing the surgery, DeMane and O'Neal immediately contacted Linda Lenox.

### *Medtronic Approached Lenox MacLaren and Sought an Exclusive Distribution Agreement for the Lenox MacLaren Bone Mill*

41.     DeMane and O'Neal recognized the novelty and potential for the Lenox MacLaren Bone Mill, stating to Linda Lenox that together, Medtronic and Lenox MacLaren could sell two Lenox MacLaren Bone Mills to every operating room in the world.

42.     Lenox MacLaren was interested in partnering with Medtronic — one of but a handful of distributors in the medical device field and, arguably, the largest.

43.     Medtronic proposed that the parties enter into an exclusive licensing agreement, under which Lenox MacLaren would manufacture and Medtronic would distribute the product for a period of five years.

44.     Lenox MacLaren and Medtronic negotiated the terms and conditions of this Agreement from late 1999 to April 2000, with negotiations culminating in the Exclusive Supply and License Agreement (the "Agreement") between Lenox MacLaren and MSD USA, a wholly-owned subsidiary of Sofamor Danek (in turn, a wholly owned subsidiary of Medtronic, Inc.).

2734113.08

45.     The Agreement created a two-way exclusive relationship between Lenox MacLaren and MSD USA: during the Agreement's five-year term, Lenox MacLaren agreed to supply the Lenox MacLaren Bone Mill exclusively to MSD USA.  Lenox MacLaren could no longer market or sell the Lenox MacLaren Bone Mill directly to surgeons, as it had prior to the Agreement.  In turn, MSD USA agreed to purchase the Lenox MacLaren Bone Mill exclusively from Lenox MacLaren and resell the Lenox MacLaren Bone Mill to the medical market.

46.     Medtronic believed that Lenox MacLaren's reputation and goodwill in the industry would be an important aspect of the Lenox MacLaren Bone Mill.

47.     Lenox MacLaren agreed to Medtronic's terms based on Medtronic's widespread distribution capability and international presence.  Lenox MacLaren believed Medtronic would use its best efforts to market and sell the Lenox MacLaren Bone Mill, given its enthusiasm for the product, and, coupled with the superior nature of the product, the Lenox MacLaren Bone Mill would successfully penetrate the market.

**Medtronic Exploited the Relationship To Limit Lenox MacLaren Bone Mill Sales While Simultaneously Developing A Substitute Bone Mill.**

48.     Unbeknownst to Lenox MacLaren until 2006, MSD USA, with the help of the other Medtronic Defendants, was loaning Lenox MacLaren Bone Mills to surgeons and hospitals, rather than selling them as intended by Lenox MacLaren's relationship with Medtronic (the "Loaner Program").

49.     The Loaner Program achieved twin purposes for Medtronic: cultivating widespread interest in a bone mill while preserving the relevant market space for the upcoming Midas Rex Legend electric bone mill to fill, upon information and belief, marketed by Medtronic PS Medical.   In conjunction with the improper recall of Lenox MacLaren's Bone Mill,

Medtronic's Midas Rex Legend electric bone mill was a Medtronic surgeon's only available option in the market — even though it cost significantly more and lacked several key features of the Lenox MacLaren Bone Mill.

***By Loaning Lenox MacLaren Bone Mills, Rather than Selling Them, Medtronic Created the Market for a Precision Bone Mill While Simultaneously Preserving First Mover Advantage for Itself***

50.     MSD USA initially purchased five hundred Lenox MacLaren Bone Mills for resale, with the implicit understanding that it would purchase more mills as it sold the original five hundred.  Much to Lenox MacLaren's surprise, MSD USA purchased no more Lenox MacLaren Bone Mills.

51.     Because MSD USA failed to meet its quarterly purchase requirement, Lenox MacLaren notified MSD USA in November 2002 that MSD USA's exclusivity had ended.

52.     Medtronic never informed Lenox MacLaren about the Loaner Program. Lenox MacLaren did not discover the Loaner Program until 2006.

53.     Lenox MacLaren discovered that Medtronic loaned the Lenox MacLaren Bone Mill to interested surgeons and hospitals thousands of times.  Loans were made domestically and internationally.  The original five hundred Lenox MacLaren Bone Mills were used in an almost countless number of surgeries.

54.     In a typical scenario, a Lenox MacLaren Bone Mill would be loaned to a hospital in State A for a single surgery, shipped back to Medtronic after use, sterilized, and immediately shipped to State B for use in another hospital the following day.  This process was repeated thousands of times.

2734113.08

55.     Upon information and belief, in 2003, Medtronic began manufacturing and selling a pneumatic bone mill.  While the pneumatic bone mill competed with the Lenox MacLaren Bone Mill during the term of the Agreement, it lacked several advantages of the Lenox MacLaren Bone Mill.

56.     The pneumatic bone mill was air pressure-driven (rather than electric) and required installation of bulky specialized equipment in the operating room.  The pneumatic bone mill was not cordless, and required a drill attachment connected to a pneumatic line.  The pneumatic line was thick, cumbersome, and could impede the surgical procedure. Many operating rooms also have limited pneumatic connections.

57.     Interest in the Lenox MacLaren Bone Mill was strong, as evidenced by the thousands of surgeries performed using the Lenox MacLaren Bone Mill under Medtronic's Loaner Program.  Lenox MacLaren also discovered that other medical device distributors had strong interest in distributing the Lenox MacLaren Bone Mill, but those distributors wrongly believed that Lenox MacLaren was still in an exclusive agreement with Medtronic.  Medtronic did nothing to counter this notion — in fact, upon information and belief, certain Medtronic distributors falsely stated that the relationship with Lenox MacLaren was still exclusive after exclusivity had been revoked.

58.     Lenox MacLaren actively marketed the Lenox MacLaren Bone Mill to other distributors, but could not overcome the false impression that Medtronic was in an exclusive relationship with Lenox MacLaren.

2734113.08

***Medtronic was Uniquely Positioned to Flood the Market with its Competing Electric Bone Mill after Eliminating Lenox MacLaren***

59.     In 2002, Medtronic filed a patent application for an electric bone mill similar to the Lenox MacLaren Bone Mill (the "Midas Rex Legend"), but it lacked many of the Lenox MacLaren Bone Mill's advantages.  In 2006, the patent issued for the Midas Rex Legend electric bone mill and was assigned to Medtronic, Inc.  Upon information and belief, Medtronic PS Medical began marketing and selling the Midas Rex Legend electric bone mill in approximately January 2007.

60.     Medtronic used the Loaner Program to cultivate interest in a precision bone mill without flooding the relevant market with actual sales. Medtronic's tactic provided Medtronic with ample opportunity to invent and patent the Midas Rex Legend as a substitute in the market for the Lenox MacLaren Bone Mill.  The Loaner Program served Medtronic's anticompetitive goals.

61.     Spinal surgeons in today's health care environment tend to use the same types of instruments and implants from one surgery to the next. To maintain familiarity and consistency between operations, surgeons typically select one source for their instruments and implants, and even become closely affiliated with that source over time (*i.e.*, a surgeon will purchase all necessary surgical implements and instruments almost exclusively from Medtronic for all surgeries).

62.     The success of Medtronic's Loaner Program highlights this trend of exclusivity among individual surgeons and hospital buyers, who repeatedly purchased implants and "borrowed," at no charge, the various instruments provided with the implants, including the Lenox MacLaren Bone Mill.  Given Medtronic's high percentage market share in the spinal

- 15 -

surgery marketplace, there are thousands of surgeons in the United States alone who are considered "Medtronic surgeons" due to the fact that they purchase or use instruments and implants exclusively from Medtronic.

63.     After readying the Midas Rex Legend electric bone mill for production, Medtronic used its monopoly power to destroy the reputation of the most competitive product on the market: the Lenox MacLaren Bone Mill.

**To Solidify A Dominant Position In The Market, Medtronic Destroyed The Reputation Of The Lenox MacLaren Bone Mill Before Introducing The Midas Rex Legend.**

64.     After loaning the Lenox MacLaren Bone Mill thousands of times over five years – thus limiting its introduction into the market and preventing Lenox MacLaren's production of more mills in tandem with demand – Medtronic instituted a voluntary FDA recall of the Lenox MacLaren Bone Mill based on unconfirmed reports and faulty tests, tarnishing the reputation of the Lenox MacLaren Bone Mill.  Not coincidentally, at the same time Medtronic eliminated the Lenox MacLaren Bone Mill from the market, Medtronic introduced the Midas Rex Legend electric bone mill: a portable, stand-alone bone mill designed to replace the Lenox MacLaren Bone Mill in the market.

*Medtronic's False Assertion that the Lenox MacLaren Bone Mill was Defective Served Medtronic's Monopolistic Goals*

65.     Medtronic, upon information and belief, received three complaints from Japan concerning the introduction of metal fragments into bone tissue during milling by the Lenox MacLaren Bone Mill from Sofamor Danek and Sofamor Danek Japan.

66.     Medtronic informed Lenox MacLaren of the problems with the Lenox MacLaren Bone Mills in Japan.  Lenox MacLaren offered its full cooperation in the investigation.

- 16 -

67.     Lenox MacLaren immediately raised the possibility that the malfunctions in Japan were due to improper use; specifically, cutting coral rather than human bone.  Coral is much harder than human bone, and the Lenox MacLaren Bone Mill is designed only to cut human bone.  In Japan, coral is frequently used as substitute for human bone in spinal fusion surgeries.

68.     The use of coral would result in jamming and displacement of the cutting blades and eventual scarring on the blade housing, problems that could result in the introduction of metal fragments into bone.  However, Lenox MacLaren never proved this theory, as it was never given the chance to evaluate any of the allegedly defective Lenox MacLaren Bone Mills from Japan.

69.     Lenox MacLaren also informed Medtronic that improper assembly of the Lenox MacLaren Bone Mill could be the cause of the problems reported from Japan.

70.     Lenox MacLaren included instructions on proper assembly and use, including the express disclaimer that the Lenox MacLaren Bone Mill could only be used to mill human bone. Lenox MacLaren Bone Mills were repackaged by Medtronic prior to shipping, and, upon information and belief, Medtronic never provided any instructions to end-users.

71.     Medtronic dismissed the possibility that the Japanese malfunctions were due to improper use of the Lenox MacLaren Bone Mill.  Medtronic stated, based on its internal tests, that it could recreate the problems experienced in Japan.  After receiving the reports from Japan, Medtronic's Quality Assurance department tested two Lenox MacLaren Bone Mills that Medtronic had in inventory (but did not test the actual, allegedly malfunctioning mills from Japan).

2734113.08

72.     Medtronic acknowledged that the two tests Medtronic conducted were invalid because the tests used improper procedures and implant material — the Lenox MacLaren Bone Mill is designed only to cut human bone, not the synthetic bone used in Medtronic's tests. Medtronic provided Lenox MacLaren digital photos from the faulty tests showing scarring on the blade housing.

73.     Nevertheless, Medtronic did not share the blades or allegedly defective bone mills with Lenox MacLaren.

74.     Then, in approximately October 2006, Medtronic demanded that Lenox MacLaren contact the FDA and initiate a voluntary recall of all Lenox MacLaren Bone Mills. Lenox MacLaren asked Medtronic to provide the allegedly defective Lenox MacLaren Bone Mills for testing, but Medtronic refused.

75.     Medtronic's refusal to provide Lenox MacLaren an opportunity to evaluate the allegedly defective Lenox MacLaren Bone Mills is contrary to both Medtronic's internal protocol and the custom among manufacturers of FDA-regulated devices.

76.     Medtronic's demand to recall the Lenox MacLaren Bone Mill was also unusual because Medtronic has been historically hesitant to recall even defective products.  Lenox MacLaren has since discovered a number of incident reports — more numerous and severe than the alleged Lenox MacLaren incident reports — involving Medtronic-manufactured devices where Medtronic neither issued a voluntary recall nor requested an FDA investigation.

77.     Lenox MacLaren declined to initiate a voluntary FDA recall based on unsubstantiated reports and testing.

2734113.08

78.     Medtronic stated that the Japanese Ministry of Health, Labour and Welfare (with powers equivalent to those of the FDA) was investigating the alleged defect and would soon be alerting the FDA.  Through its own investigation, Lenox MacLaren has been unable to find anyone with knowledge of the investigation at the Japanese Ministry of Health, Labour and Welfare or any publicly available information suggesting an investigation or recall was ever conducted in Japan involving the Lenox MacLaren Bone Mill.

79.     Without allowing Lenox MacLaren to perform any tests or verify the reports from Japan, Medtronic unilaterally issued an urgent FDA device recall on October 20, 2006. Hospitals immediately stopped using all Lenox MacLaren Bone Mills.

80.     Upon information and belief, Medtronic knew that its tests were faulty and Medtronic knew that its recall was based on false test results.

81.     Upon information and belief, Medtronic anticipated that the Midas Rex Legend electric bone mill would be ready for sale at the time of the improper recall, thus allowing Medtronic to fill the void created by the improper recall.  Medtronic sales and marketing employees, including Ronald Moore, Product Manager for the Midas Rex Legend electric bone mill, corresponded with each other, across Medtronic groups and subgroups, to ensure that the impacted customers knew that the Midas Rex Legend would be available to replace the Lenox MacLaren Bone Mill.

### An FDA Investigation and Lenox MacLaren Tests Confirmed that the Lenox MacLaren Bone Mill was Not Defective

82.     Medtronic eventually provided Lenox MacLaren with the five allegedly defective mills tested by Medtronic (although not the allegedly defective Lenox MacLaren Bone Mills

2734113.08

from Japan).   Lenox MacLaren performed extensive independent and internal tests on the five Lenox MacLaren Bone Mills.

83.     Lenox MacLaren's tests confirmed that the problems reported by Medtronic could only have been caused by user error.

84.     The National Engineering and Research Development Company in Golden, Colorado performed independent tests ("National Engineering"), concluding that none of the five bone mills were outside measurement tolerance levels.   National Engineering verified that when properly assembled and operated, the Lenox MacLaren Bone Mills were functioning as designed.

85.     The internal tests conducted by Lenox MacLaren confirmed that one of three types of user error produced the scarring allegedly seen in Japan and in the faulty Medtronic tests, resulting in introduction of metal fragments: (1) use of a substance, such as coral, that was harder than human bone; (2) mis-assembly of the bone mill, particularly failing to properly secure the screws; and (3) over-torqueing by the user during bone milling.

86.     In mid-November 2006, the FDA independently investigated and tested the Lenox MacLaren Bone Mill and concluded that it was not defective.

87.     In fact, the FDA did not require any corrective action on the part of Lenox MacLaren, nor did it require a recall of any Lenox MacLaren Bone Mills.

88.     In light of the discovery that Japanese surgeons may have misused the Lenox MacLaren Bone Mill, Lenox MacLaren voluntarily agreed to: (1) change the instructions included with the Lenox MacLaren Bone Mill to include a more explicit disclaimer that the Lenox MacLaren Bone Mill is not suitable for use with cortical bone, coral, or bone

morphogenic protein and that the screws must be properly tightened; and (2) establish a procedure to track and follow-up on any reported problems with the Lenox MacLaren Bone Mill.

***Medtronic Filled the Market Void it Artificially Created with the Midas Rex Legend Electric Bone Mill***

89.     Simultaneously, Medtronic was implementing its plan to replace the Lenox MacLaren Bone Mill with its Midas Rex Legend electric bone mill.  Upon information and belief, one or more high-level Medtronic product managers responsible for domestic and international sales, citing the soon-to-be-introduced Midas Rex Legend electric bone mill, highlighted to Medtronic's sales force those customers affected by the improper recall.  Upon information and belief, Medtronic targeted former Lenox MacLaren Bone Mill customers for sales of its Midas Rex Legend.

90.     Ron Moore, a sales executive for Medtronic Neurologic Technologies, an identity of Medtronic PS Medical, encouraged Medtronic's sales force immediately to contact all customers affected by the recall of the Lenox MacLaren Bone Bill, as the recall would "create an increase in demand" for the Medtronic pneumatic bone mill as well as the Midas Rex Legend electric bone mill "when available."  Moore urged all Medtronic representatives "to call on these [Lenox Bone Mill] accounts immediately!"

91.     Medtronic's monopolistic scheme came to full fruition when the Midas Rex Legend electric bone mill became available in January 2007, only months after Medtronic, Inc's patent on the Midas Rex Legend electric bone mill issued and the Lenox MacLaren Bone Mill recall was substantially underway.

2734113.08

***Medtronic's Monopolistic Conduct Harmed Competition in the Surgical Bone Mill Market by Increasing Costs and Reducing Choices Available to Surgeons***

92.     The Lenox MacLaren Bone Mill sold for approximately $10,000.00.   Being constructed of stainless steel (and thus reusable), this was a one-time cost.  The only maintenance typically required was blade sharpening — a service Lenox MacLaren performed for free.

93.     The Midas Rex Legend electric bone mill typically sold, upon information and belief, for approximately $5,000.00-$6,000.00 per base unit.   Upon information and belief, Medtronic occasionally offered discounts whereby the Midas Rex Legend electric bone mill sold for less than this amount but still at significant revenue to Medtronic.

94.     Upon information and belief, Medtronic has never instituted a "loaner program" for its Midas Rex Legend and has instead sold the Midas Rex Legend electric bone mill directly into the market through Medtronic PS Medical and other subsidiaries.

95.     The cumulative costs of ownership for the Midas Rex Legend electric bone mill over its life are substantial.  The Midas Rex Legend electric bone mill uses disposable bone milling cups.  A new cup, costing approximately $250.00, must be purchased for every surgery. If a hospital were to perform, for example, 1000 spinal fusion surgeries per month, the cost of using the Midas Rex Legend electric bone would be at least $250,000.00 per month.  If Midas Rex Legend electric bone mills were used in all of the estimated 900,000 spinal fusions surgeries performed per year in the United States, the cost would exceed $18.7 million.

96.     Despite having a disposable bone cup, the base of the Midas Rex Legend electric bone mill must still be sterilized following every spinal fusion surgery.  The Midas Rex Legend electric bone mill thus offers no practical advantage over the Lenox MacLaren Bone Mill, yet costs significantly more.

- 22 -

97.     In addition to high cost, the Midas Rex Legend electric bone mill, upon information and belief, mills bone inconsistently.  Because the Midas Rex Legend is electric, the blades move at a high rate of speed, which can damage the bone cells.

98.     Also, milling the bone for too long can compromise cellular integrity, rendering the bone tissue useless for achieving a successful fusion.  The Midas Rex Legend electric bone mill is only as effective at producing a quality bone material as the individual nurse or surgeon operating the mill.

99.     The Lenox MacLaren Bone Mill does not damage the bone cells because of its innovative grinding chamber and blade configuration, driven by the hand-crank.  It is impossible for a Lenox MacLaren Bone Mill user to over-mill the bone or mill the bone too forcefully to the point where the bone graft is destroyed or rendered useless for fusion.

100.    Medtronic, by excluding Lenox MacLaren from the Surgical Bone Mill Market, increased prices and, perhaps more importantly, deprived surgeons of a superior bone mill.  Medtronic's monopolistic conduct has severely damaged the Surgical Bone Mill Market.

**Medtronic's Exclusionary Conduct Resulted In Monopoly Power Over The Surgical Bone Mill Market.**

101.    Medtronic's improper, intentional, and wrongful recall of the Lenox MacLaren Bone Mill effectively destroyed the Lenox MacLaren Bone Mill's reputation.  The improper recall effectively ended Lenox MacLaren's efforts to re-enter or continue selling the Lenox MacLaren Bone Mill in the market, independently or through other distributors.  Medtronic exploited the Lenox MacLaren Bone Mill to create demand with the Loaner Program and then used its sizeable market power and crippling recall to exclude Lenox MacLaren from the market.

2734113.08

***The Relevant Product Market is the Surgical Bone Mill Market***

102.    The relevant product market in this case is the surgical bone mill market ("Surgical Bone Mill Market").

103.    The Surgical Bone Mill Market includes all bone mills that function to mill bone for use during spinal fusion surgeries.  Examples of bone mills in the Surgical Bone Mill Market include the Lenox MacLaren Bone Mill, Medtronic's pneumatic bone mill, and the Midas Rex Legend electric bone mill. Although various bone mills have different power sources (*e.g.*, pneumatic, electric, or hand-crank driven), different reuse methods (*e.g.*, sterilizing the entire bone mill versus disposable bone cups), and different sizes (large pneumatic bone mills versus hand-held bone mills), bone mills are reasonably interchangeable.  All bone mills all have the same basic use and function: milling bone for use in spinal fusion or other surgery.

104.    The Lenox MacLaren Bone Mill and the Midas Rex Legend electric bone mill are both within the Surgical Bone Mill Market.  The Midas Rex Legend's interchangeability with the Lenox MacLaren Bone Mill is evidenced by Medtronic's explicit attempts to replace the Lenox MacLaren Bone Mill with the Midas Rex Legend electric bone mill.

105.    Medtronic had incentive to exclude the Lenox MacLaren Bone Mill because it was highly competitive with the Midas Rex Legend electric bone mill.  The Lenox MacLaren Bone Mill offered numerous advantages over the Midas Rex Legend electric bone mill, both in cost and function.

106.    The Surgical Bone Mill Market does not include methods of milling bone used prior to widespread adoption of bone mills, such as hand-cutting bone fragments.  Crushing bone fragments with brute force using surgical instruments (*e.g.,* surgical scissors, pestles, pliers, etc.)

2734113.08

is not a reasonable substitute for the precision afforded by a bone mill.  Further, upon information and belief, surgeons no longer employ such crude methods with the wide availability of bone mills.

### *The Relevant Geographic Market Appears to Be Worldwide*

107.    Spinal fusion surgeries are performed throughout the industrialized world.  Upon information and belief, Medtronic, capitalizing on its international distribution network, sells its bone mills throughout the world.  As the self-described "world leader in medical technology," bone mill purchasers worldwide can purchase bone mills from Medtronic.

108.    The relevant geographic market appears to be worldwide, and therefore includes:

a.    The United States, which leads the world in the number of spinal fusion surgeries;

b.    Japan, which is a significant market for spinal fusion surgery, second only to the United States.

(1)    At least 92 Lenox MacLaren Bone Mills were sold in Japan.

(2)    Upon information and belief, Lenox MacLaren Bone Mills were used in thousands of spinal fusion surgeries in Japan as part of Medtronic's Loaner Program.

(3)    Upon information and belief, Sofamor Danek Japan and/or its predecessor entities loaned and sold Lenox MacLaren Bone Mills in Japan.

(4)    Upon information and belief, Medtronic sells its bone mills to the Japanese market through Sofamor Danek Japan.

- 25 -

2734113.08

       c.      Other nations yet to be determined.

109.    The Surgical Bone Mill Market constitutes a part of trade and commerce among the several States and with foreign nations.

### *Medtronic Excluded Lenox MacLaren from the Surgical Bone Mill Market and has the Power to Control Bone Mill Prices*

110.    Medtronic's improper and deceptive recall of Lenox MacLaren Bone Mills destroyed the reputation of the Lenox MacLaren Bone Mill.  Lenox MacLaren has sold virtually no Lenox MacLaren Bone Mills, despite efforts to distribute the Lenox MacLaren Bone Mill through other distributors.  These distributors wrongly believed that Medtronic had exclusive distribution rights with Lenox MacLaren, even after exclusivity ended.

111.    Distributors also had no incentive to enter into an agreement with Lenox MacLaren because surgeons could not order the Lenox MacLaren Bone Mill.  Upon information and belief, although many spinal surgeons preferred the Lenox MacLaren Bone Mill and recognized that the recall was improper, liability concerns related to an FDA recall foreclosed using the Lenox MacLaren Bone Mill.

112.    Lenox MacLaren's efforts to engage a different distributor were also unsuccessful based on the market identity of the Lenox MacLaren Bone Mill as a Medtronic product.  Not only was the Lenox MacLaren Bone Mill stamped with the Medtronic name, but the small number of distributors in the market would have required a complete change of the bone mill to distinguish their product from the *Medtronic* Lenox MacLaren Bone Mill.

113.    Medtronic thus excluded Lenox MacLaren — a direct competitor — from the Surgical Bone Mill Market.

2734113.08

114.    Medtronic boasted in its 2009 Annual Report that it held "market-leading positions in almost all of the major markets in which we operate."  Upon information and belief, Medtronic is the market leader in the Surgical Bone Mill Market and controls more than 70% of the Surgical Bone Mill Market worldwide.

### *Medtronic's Monopoly Power is Extremely Potent Because of the High Barriers to Entering the Surgical Bone Mill Market*

115.    The barriers to entering the Surgical Bone Mill Market are high.  Developing a bone mill requires years of research and development and investment of millions of dollars. Successfully marketing a bone mill requires obtaining patents and regulatory approval, both in the United States and abroad.

116.    Medtronic's monopoly power is thus extremely potent.  Any potential competitor attempting to enter the Surgical Bone Mill Market faces significant distribution cost, technological, and regulatory barriers.  Lenox MacLaren, despite being a small company, overcame these barriers and brought its innovative product to market, only to be thwarted by Medtronic's exclusionary conduct.

### *Lenox MacLaren Suffered an Antitrust Injury*

117.    Medtronic removed Lenox MacLaren as a competitor from the Surgical Bone Mill Market.  Lenox MacLaren sold virtually no Lenox MacLaren Bone Mills after Medtronic's improper recall.  This is the type of injury that the Sherman Antitrust Act is intended to prevent.

118.    Medtronic's scheme of binding Lenox MacLaren to an exclusive Agreement, plus the Loaner Program and the improper recall, caused Lenox MacLaren's antitrust injury.

119.    After exclusivity ended, Lenox MacLaren actively marketed the Lenox MacLaren Bone Mill.  For instance, Lenox MacLaren approached a major Medtronic competitor, DePuy,

about distributing the Lenox MacLaren Bone Mill.  Upon information and belief, DePuy never followed up because of the Lenox MacLaren Bone Mill's tarnished reputation.

120.    Upon information and belief, distributors and surgeons also declined to purchase the Lenox MacLaren Bone Mill both because of the improper recall and the mistaken belief that Lenox MacLaren was in an exclusive arrangement with Medtronic.  Nearly all of the Lenox MacLaren Bone Mills actually used in surgeries were part of Medtronic's Loaner Program.  The Lenox MacLaren Bone Mills used in the Loaner Program bore a Medtronic stamp and were branded as Medtronic products, possibly creating the mistaken impression that Lenox MacLaren's exclusivity with Medtronic remained in force.

121.    Upon information and belief, Medtronic representatives also told medical device distributors, surgeons, and hospitals that the Lenox MacLaren Bone Mill was still considered a recalled product and would cause bone tissue milled using the Lenox MacLaren Bone Mill to be contaminated.

### FIRST CLAIM FOR RELIEF
**Monopolization — Sherman Antitrust Act**

122.    Lenox MacLaren incorporates paragraphs 1-121 as if fully set forth herein.

123.    Medtronic currently possesses monopoly power in the Surgical Bone Mill Market and has the ability to control prices and exclude competition.

a.    Medtronic has the power to control prices in the Surgical Bone Mill Market because of high barriers to entry and its dominant market share, which is, upon information and belief, at least 70% of the Surgical Bone Mill Market.

2734113.08

  b.  Medtronic has the power to exclude competition from the Surgical Bone Mill Market.  Medtronic has exercised its power to exclude competition from Lenox MacLaren.

124. Medtronic acquired, enhanced, and maintained its monopoly power in the Surgical Bone Mill Market through an array of anticompetitive, predatory, and exclusionary conduct, specifically:

  a.  Medtronic used the Lenox MacLaren Bone Mill and its Loaner Program to create demand for a precision bone mill.

  b.  Medtronic destroyed the reputation of the Lenox MacLaren Bone Mill through an improper, unjustified recall, thereby excluding Lenox MacLaren from the Surgical Bone Mill Market.

  c.  Medtronic filled the artificial void in the market it created with its Midas Rex Legend electric bone mill, thereby acquiring, enhancing, and maintaining its monopoly power in the Surgical Bone Mill Market.

125. Medtronic's conduct has unreasonably restrained, suppressed, and weakened competition in the Surgical Bone Mill Market.  Through this conduct, Medtronic's market power has been entrenched and expanded, resulting in greater domination of the Surgical Bone Mill Market and enhancement of barriers to entry.

126. Medtronic's conduct and resulting monopoly in the Surgical Bone Mill Market violate the Sherman Antitrust Act, 15 U.S.C. § 2.

2734113.08

127.    This claim includes conduct involving foreign trade and commerce because Medtronic's attempted monopolization had a direct, substantial, and reasonably foreseeable effect on:

        a.     Domestic trade;

        b.     Import trade or import commerce with foreign nations; and

        c.     Export trade and export commerce with foreign nations and with people engaged in such trade and commerce with the United States.

128.    As a direct and proximate result of Medtronic's monopolistic conduct, competition in the Surgical Bone Mill Market has been unreasonably restrained and injured, and Lenox MacLaren has been damaged and will continue suffer damages and losses in its business and property in an amount to be proven at trial.

129.    Medtronic's conduct has directly and proximately damaged various aspects of Lenox MacLaren's business and property, including adversely affecting its sales, revenues, profits, market share, reputation, growth potential, future sales, good will, the going concern value of the business, and the value of Lenox MacLaren's intellectual property.

130.    Under 15 U.S.C. § 15, Lenox MacLaren is entitled to treble damages.

## SECOND CLAIM FOR RELIEF
### Attempted Monopolization — Sherman Antitrust Act (Alternatively)

131.    Lenox MacLaren incorporates paragraphs 1-121 as if fully set forth herein.

132.    Medtronic engaged in an array of anticompetitive, predatory, and exclusionary conduct, including:

        a.     Medtronic used the Lenox MacLaren Bone Mill and its Loaner Program to create demand for a precision bone mill.

   b.  Medtronic destroyed the reputation of the Lenox MacLaren Bone Mill through an improper, unjustified recall, thereby excluding Lenox MacLaren from the Surgical Bone Mill Market.

   c.  Medtronic attempted to fill the void in the market it created with its Midas Rex Legend electric bone mill, and sought to acquire monopoly power in the Surgical Bone Mill Market.

133. Medtronic had the specific intent to monopolize the Surgical Bone Mill Market. Medtronic's specific intent is evidenced by:

   a.  The Lenox MacLaren Bone Mill recall, which was based on faulty tests and was entirely improper;

   b.  Medtronic's false statements to Lenox MacLaren attempting to induce Lenox MacLaren into voluntarily initiating an improper recall;

   c.  Medtronic's success in destroying the Lenox MacLaren Bone Mill's reputation, thereby excluding Lenox MacLaren from the Surgical Bone Mill Market; and

   d.  Medtronic's scheme to fill the void created by Medtronic's improper recall of the Lenox MacLaren Bone Mill with its Midas Rex Legend electric bone mill, a significantly more expensive and less effective bone mill.

134. Medtronic's exclusionary conduct had a dangerous probability of achieving monopoly power.

2734113.08

a.    Medtronic, as the world's leading independent distributor of medical technology, has a commanding domestic and international presence and enjoys substantial market power in the Surgical Bone Mill Market.

b.    Medtronic has a substantial market share of the Surgical Bone Mill Market, upon information and belief, at least 70%.

c.    There are high barriers to entering the Surgical Bone Mill Market.

135.    Medtronic's attempted monopolization of the Surgical Bone Mill Market violates 15 U.S.C. § 2.

136.    This claim includes conduct involving foreign trade and commerce because Medtronic's attempted monopolization had a direct, substantial, and reasonably foreseeable effect on:

a.    Domestic trade;

b.    Import trade or import commerce with foreign nations; and

c.    Export trade and export commerce with foreign nations and with people engaged in such trade and commerce with the United States.

137.    As a direct and proximate result of Medtronic's monopolistic conduct, competition in the Surgical Bone Mill Market has been unreasonably restrained and injured, and Lenox MacLaren has been damaged and will continue suffer damages and losses in its business and property in an amount to be proven at trial.

138.    Medtronic's conduct has directly and proximately damaged various aspects of Lenox MacLaren's business and property, including adversely affecting its sales, revenues,

2734113.08

profits, market share, reputation, growth potential, future sales, good will, the going concern value of the business, and the value of Lenox MacLaren's intellectual property.

139.    Under 15 U.S.C. § 15, Lenox MacLaren is entitled to treble damages.

## THIRD CLAIM FOR RELIEF
### Intentional Interference with Prospective Business Relations

140.    Lenox MacLaren incorporates paragraphs 1-121 as if fully set forth herein.

141.    Medtronic intentionally interfered with Lenox MacLaren's prospective business relations by destroying the Lenox MacLaren Bone Mill's reputation, preventing Lenox MacLaren Bone Mill sales to third parties, and undermining Lenox MacLaren's business value and goodwill in the marketplace.

142.    Medtronic's conduct was intentional because:

        a.    Medtronic knew that its improper Lenox MacLaren Bone Mill recall, based on faulty tests and unsubstantiated reports, was likely to destroy the Lenox MacLaren Bone Mill's reputation, prevent further sales, and damage Lenox MacLaren's goodwill and business reputation; and

        b.    It was to Medtronic's competitive advantage to remove the Lenox MacLaren Bone Mill from the market.

143.    Medtronic's conduct was improper because it was anticompetitive.  Medtronic achieved its goal of removing the Lenox MacLaren Bone Mill from the Surgical Bone Mill Market through an unjustified recall.

144.    Absent Medtronic's intentional and improper conduct, there is a reasonable likelihood that Lenox MacLaren would have entered into business relations with purchasers of

the Lenox MacLaren Bone Mill.   Instead, Lenox MacLaren has sold virtually no Lenox MacLaren Bone Mills due to Medtronic's conduct.

145.    Furthermore, absent Medtronic's intentional and improper conduct, there is a reasonable likelihood that Lenox MacLaren's goodwill and business reputation would not have been damaged in the eyes of prospective business partners.   Lenox MacLaren has been unable to successfully penetrate the surgical bone mill market due to Medtronic's conduct.

146.    Lenox MacLaren has been damaged in an amount to be proven at trial.

147.    Lenox MacLaren is entitled to punitive damages based on Medtronic's willful and wanton conduct.

### FOURTH CLAIM FOR RELIEF
### Deceit Based on Fraud

148.    Lenox MacLaren incorporates paragraphs 1-121 as if fully set forth herein.

149.    Medtronic falsely represented that it would sell Lenox MacLaren Bone Mills, enhance Lenox MacLaren's reputation and standing within the Surgical Bone Mill Market, and act under the Agreement for the benefit of Lenox MacLaren.

150.    Medtronic's representations that it would sell Lenox MacLaren Bone Mills, enhance Lenox MacLaren's reputation and standing within the Surgical Bone Mill Market, and act under the Agreement for the benefit of Lenox MacLaren were material to Lenox MacLaren's decision to enter into the Agreement.   Lenox MacLaren would not have entered into the Agreement but for Medtronic's false representations.

151.    Medtronic represented that it would sell Lenox MacLaren Bone Mills, enhance Lenox MacLaren's reputation and standing within the Surgical Bone Mill Market, and act under

the Agreement for the benefit of Lenox MacLaren with the intent that Lenox MacLaren would rely on the representations to enter into the Agreement.

152.    Lenox MacLaren relied on Medtronic's false representations that Medtronic would sell Lenox MacLaren Bone Mills, enhance Lenox MacLaren's reputation and standing within the Surgical Bone Mill Market, and act under the Agreement for the benefit of Lenox MacLaren with the intent that Lenox MacLaren would rely on the representations and enter into the Agreement.

153.    Lenox MacLaren was justified in relying on Medtronic's false representation because Medtronic is the world's leading independent medical distributor, a high volume of Lenox MacLaren Bone Mill sales were expected, and Lenox MacLaren could not have known that Medtronic would use the Agreement as an anticompetitive tool to destroy Lenox MacLaren's ability to compete in the Surgical Bone Mill Market.

154.    Lenox MacLaren's reliance caused actual damages to Lenox MacLaren by destroying Lenox MacLaren's ability to compete in the Surgical Bone Mill Market.

155.    Lenox MacLaren has been damaged in an amount to be proven at trial.

156.    Lenox MacLaren is entitled to punitive damages based upon Medtronic's fraudulent conduct.

## <u>CONCLUSION AND DEMAND FOR RELIEF</u>

157.    Medtronic's anticompetitive conduct excluded Lenox MacLaren from the Surgical Bone Mill Market and created a Medtronic monopoly.  Medtronic's monopoly has resulted in increased prices and reduced choice for surgeons and their patients.  The exclusion of a small

2734113.08

company with an extremely competitive product by a monopolist is precisely the type of wrong that the antitrust laws were designed to remedy.

WHEREFORE, Lenox MacLaren respectfully requests that this Court enter judgment in its favor against the Medtronic Defendants as follows:

158.    Against Medtronic Inc., Medtronic Sofamor Danek, Inc., Medtronic PS Medical, Inc., and Medtronic Sofamor Danek Co., Ltd. for the following relief:

      a.    Actual damages;

      b.    Treble damages pursuant to 15 U.S.C. § 15 and section 6-4-114(1), C.R.S. 2009;

      c.    Punitive damages;

      d.    Attorney fees and costs;

      e.    Post-judgment interest at the statutory rate; and

      f.    All other such and further relief that this Court may deem just and equitable.

159.    Plaintiff Lenox MacLaren hereby demands a jury on all issues so triable.

2734113.08

Dated:  September 1, 2010       Respectfully submitted,

**POLSINELLI SHUGHART PC**

/s/ G. Stephen Long
G. Stephen Long
Nicole A. Westbrook
Cash K. Parker
1515 Wynkoop, Suite 600
Denver, CO 80202
Telephone:  303-572-9300
Fax:  303-572-7883
E-mail:   stevelong@polsinelli.com
          nwestbrook@polsinelli.com
          cparker@polsinelli.com

**SHERIDAN ROSS P.C.**
Joseph E. Kovarik
Ian R. Walsworth
1560 Broadway, Suite 1200
Denver, CO 80202
Telephone:  303-863-9700
Fax:  303-863-0223
E-mail:   jkovarik@sheridanross.com
          iwalsworth@sheridanross.com

*ATTORNEYS   FOR   PLAINTIFF   LENOX
MACLAREN  SURGICAL  CORPORATION*

2734113.08